**GALLEGOS et al. v. SMITH.**

No. 9310.

Circuit Court of Appeals, Ninth Circuit.

May 9, 1940.

Thomas W. Nealon, of Phoenix, Ariz. for appellants Gallegos and Gudmundsen.

Alexander B. Baker, Louis B. Whitney, and Lawrence L. Howe, all of Phoenix, Ariz., for appellant Hill, receiver.

John F. Reilly and James G. Wilson, both of Portland, Or., for all other appellants.

Rogers Mac Veagh and MacCormac Snow, both of Portland, Or., and Willard H. Wirtz, of Salem, Or., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

The court below dismissed a bill filed by appellants to obtain appointment of ancillary receivers in aid of a primary receivership in Arizona and to obtain a decree establishing a lien in appellants on certain assets in Oregon.

Intermountain Building & Loan Association, hereafter called Intermountain, was organized under the laws of Utah, and issued "Installment Savings Stock" certificates by which it agreed to pay a stipulated sum to the holder thereof upon a specified maturity date if the holder made the installments required thereby. The certificates contained the following clause: "As security for the performance of the obligations of the Association hereunder, the Association will hold intact, subject to the constant examination and inspection of the banking department of the State of Utah, first mortgages on improved Real Estate in an amount equal to at least one hundred per cent of its liabilities hereunder, less the amount of any loans made on this and like certificates or any certificates issued in lieu thereof."

A certificate, dated February 26, 1924, was issued to appellants Gallegos, husband and wife, in Arizona.

On July 7, 1924, Intermountain qualified and was authorized to do business in Oregon, pursuant to 2 Ore.Code Ann., 1930, § 25-317. At that time, § 25-316 prohibited a foreign building and loan association from doing business in Oregon unless such association deposited "securities of the value of $100,000" with certain depositories. Intermountain designated an Oregon trust company as its depository.

On August 12, 1924, Intermountain issued an Installment Savings Stock certificate to appellant Gudmundsen, and issued one to another person who assigned it to Gudmundsen.

Intermountain, on June 29, 1930, without the permission or authorization of the Utah Bank Commissioner, moved its principal office and place of business and its corporate records, books and accounts from Salt Lake City, Utah, to Phoenix, Arizona, where it thereafter carried on its business.

Oregon Laws, 1931, p. 741, Ch. 373 became effective on June 6, 1931. Section 1 provided that the act would govern all building and loan associations doing business in Oregon. Section 4 empowered the corporation commissioner to appoint "a savings and loan supervisor" who was to enforce and assist the corporation commissioner in enforcing the act. Section 30 provided in part: "Every association governed by this act shall promptly deposit and keep with the corporation commissioner or with a duly chartered and responsible bank or trust company of this state, in trust for all its members and creditors, all notes, mortgages and other securities received by it in the usual course of business * * *."

Section 57 authorizes the corporation commissioner, whenever it shall appear to him that a savings and loan association "is conducting its business in an unsafe or unlawful manner", to direct the supervisor of savings and loan associations "to take possession of all books, records and assets of every description of such association".

Section 52 requires the corporation commissioner to post a notice to the effect that he is taking possession of the savings and loan association, and "If such possession of the property and business of an association has been taken by the corporation commissioner, without the request or written consent of its directors, said directors may, within ten (10) days after the posting of said notice, apply to the circuit court of the county in which the principal office of

said association is located for an order requiring the corporation commissioner to appear and show cause why he should not be enjoined from continuing in such possession. Failure to file such application within ten (10) days shall be construed as a consent to such possession and be a bar to a later filing of such application. * * * In the event no application is made to the court, as and within the time provided for herein to restrain said corporation commissioner * * * the corporation commissioner shall continue in possession and control of the properties and business of said association until said association, its properties and business, are sold, liquidated or restored to the directors by said corporation commissioner; and during such possession and control by the corporation commissioner no receiver for said association shall be appointed by any court * * *."

Section 60 provides the method of liquidation. The corporation commissioner is directed to prepare a complete statement of assets of the association; give notice of the time within which claims may be filed; prepare a schedule of claims presented specifying the classes of those he approves and of those he disapproves; liquidate the assets, and distribute the proceeds thereof. Claimants whose claims are rejected are authorized to file an action to enforce payment. After final distribution, the corporation commissioner is required to file a final account of his liquidation, to which objections may be filed in the circuit court of the county in which the principal office of the association is located, by specified parties within 30 days thereafter, and if none are filed objections "shall forever be barred", and after "objections, if any, have been finally disposed of by the court, the liquidation shall be deemed closed".

Section 63 requires a "foreign savings and loan association" to deposit with the corporation commissioner $100,000 of securities of a kind specified, and provides that he "shall have authority to require such association to deposit additional securities, and to order a change in all of the securities so deposited, at any time". It further provides that such "deposit shall be held as security until all claims of residents of this state shall have been fully redeemed and paid off and its contracts and obligations to residents of this state have been fully performed and discharged".

Peculiarly, the act did not provide expressly that the corporation commissioner shall be a receiver of the associations which he liquidates. It did not provide expressly for the filing of any kind of a proceeding in any court to supervise or assist his liquidation. By subsequent amendments of § 60 (see 5 Ore.Code Ann. § 25-3,101) the corporation commissioner is spoken of as a "statutory receiver of the association", and his administration as "receivership proceedings" and requires him to "apply to the circuit court in and for the judicial district in which the principal office of the savings and loan association shall be located, for an order confirming any action theretofore taken by him or authorizing him to do any act or execute any instrument, not expressly authorized by this act, which order shall be made and entered only after a hearing and upon such notice as the court shall prescribe". The amendments further provide that such court "shall have original jurisdiction in equity of all proceedings growing out of the operation or liquidation by the corporation commissioner of said associations, pursuant to the provisions of this act, with power in said court on petition of the corporation commissioner, and notice to all persons affected thereby, to declare the rights, status and other legal relations of all persons interested as debtor, creditor or member of such association."

The Oregon supervisor of savings and loan associations made known the requirements of § 63 above mentioned, to Intermountain on October 2, 1931. Intermountain did not comply with the statute until nearly two years later.

On April 18, 1933, Gallegos, his wife, Gudmundsen and another filed suit in the United States District Court for Arizona, hereafter called the Arizona court, to obtain the appointment of a receiver for Intermountain's assets and business.

Intermountain deposited with the Oregon corporation commissioner mortgages on September 27, 1933 and October 31, 1933, pursuant to his requests of September 8, 1933 and October 17, 1933. The face value of the mortgages so deposited was $210,-008.58. All such mortgages had previously been deposited with the Oregon trust company.

On March 19, 1934, the Oregon corporation commissioner learned that the Utah Bank Commissioner had taken charge of Intermountain's affairs in Utah, and that "its capital was impaired and that it was conducting its business in the State of Ore-

gon in an unsafe and unlawful manner". He directed the supervisor of savings and loan associations to take possession and hold all Intermountain's books, records and assets, and gave notice of his action. On March 26, 1934, he appointed a deputy to take charge of Intermountain's affairs.

Intermountain's directors did not within ten days after the corporation commissioner had given notice of his action, petition any court to restrain the corporation commissioner from continuing in possession of Intermountain's business and assets. On April 11, 1934, the corporation commissioner filed a petition in the circuit court of Multnomah County, Oregon, hereinafter called the Oregon state court, and obtained a show-cause order. The record before us does not disclose what either document otherwise was or what either contained.

On April 20, 1934, the Arizona court made an order appointing a temporary receiver in Arizona for all Intermountain's assets in Arizona. Appeal was taken to this court from the order.

Intermountain's total liability exceeded $2,300,000 exclusive of interest. There were about 740 Oregon claimants, such claims totalling $220,966.96, all of which except $108.50 were incurred prior to the effective date of Ch. 373, Oregon Laws, 1931, on June 6, 1931. The book value of Intermountain's assets in Oregon was $578,000, although the actual value thereof is much less. The corporation commissioner has proceeded in the liquidation of the assets, and has obtained in the Oregon state court about 150 orders regarding his liquidation proceedings.

On August 5, 1935, this court affirmed the order of the Arizona court, and on September 6, 1935, denied a rehearing. Intermountain Building & Loan Ass'n v. Gallegos, 9 Cir., 78 F.2d 972. On February 8, 1936, the Arizona court appointed permanent receivers for Intermountain's assets.

On April 22, 1936, the bill herein was filed by appellants to obtain the appointment of ancillary receivers in aid of the primary receivership in Arizona. Thereafter on January 5, 1937, the Arizona court entered a final decree, adjudging that appellants Gallegos and Gudmundsen had claims in excess of $3,000 and establishing "an equitable lien therefor * * * upon all of the assets and property of [Intermountain] of all kinds and classes, whether real, personal or mixed, and wherever situated". It was further decreed that

Intermountain's assets "wherever said assets may be situated and of whatever character they may be, belong in the possession of" the receivers.

The court below held in the instant case that the Oregon state court had first assumed possession of Intermountain's assets and should be permitted to continue its administration. Decree dismissing the bill was made, from which this appeal was taken.

In a case substantially like this, involving Intermountain and a California statutory receivership, this court passed on many of the questions raised here. Brashear v. Intermountain Building & Loan Ass'n, 9 Cir., 109 F.2d 857.

■ Refusal to appoint receivers herein was proper, unless "it appears that the procedure afforded by state law is inadequate or that it will not be diligently and honestly followed". Gordon v. Washington, 295 U.S. 30, 39, 55 S.Ct. 584, 589, 79 L.Ed. 1282; Brashear v. Intermountain Building & Loan Ass'n, supra, 109 F.2d 862, and cases cited. There is no contention that the Oregon law will not be diligently and honestly followed. It is contended that such law is inadequate because Intermountain was insolvent when it deposited the securities with the Oregon corporation commissioner; that appellants Gallegos and Gudmundsen had a lien on the securities of equal right with the Oregon claimants; that the corporation commissioner will distribute the proceeds derived from his liquidation to the Oregon claimants thus depriving other claimants of their liens, and that the Oregon statutes authorizing such course of action by the corporation commissioner are unconstitutional and void.

Even if true, these contentions do not disclose that the liquidating procedure specified in the Oregon statutes is inadequate. It might perhaps be inadequate if there was no means by which the appellant claimants could assert their rights, if any, in the proceeds of the liquidation. However, the Oregon statutes do not purport to deprive any claimant of his right to present his claim to the Oregon state court. All such claims may, in fact, be presented to such court. We hold that the procedure as specified in the Oregon statutes is not inadequate. Brashear v. Intermountain Building & Loan Ass'n, supra, 109 F.2d 863.

Considerable argument is made that Intermountain was insolvent at the time the deposits were made, and also concerning the failure of the court below to make a finding regarding the alleged insolvency of Intermountain. The refusal to make such a finding was proper. Brashear v. Intermountain Building & Loan Ass'n, supra, 109 F.2d 863.

Affirmed.